[S. F. No. 3588. In Bank.—February 9, 1904.]

In the Matter of the Estate of JOSÉ VICENTE DE LA-
VEAGA, Deceased.    MARIA JOSEFA CEBRIAN et
al., Appellants, v. A. J. M. DE LAVEAGA et al., Re-
spondents.

ESTATES OF DECEASED PERSONS—DISTRIBUTION—REPRESENTATION OF DE-
CEASED BROTHER BY ILLEGITIMATE CHILD—ACKNOWLEDGMENT OF PA-
TERNITY—ADOPTION.—An illegitimate child of a deceased brother of
the decedent does not acquire the right to represent his father by
inheriting any part of the estate of the decedent by merely becom-
ing the heir of his father, by an acknowledgment of paternity in the
presence of a competent witness, under section 1387 of the Civil
Code; and if not legitimated by adoption, under section 230 of that
code, a decree of distribution to him of part of the estate in the
right of his deceased father must be reversed.

ID.—LEGITIMATION BY ADOPTION.—In order to complete legitimation of
an illegitimate child by adoption under section 230 of the Civil
Code, all of its provisions must be complied with. Where the father
never received the child into his family, or into the home in which
he lived, or into or among his kindred, and did not treat him as if
he were a legitimate child, but, on the contrary, treated him and
referred to him as an illegitimate child, there is no legitimation by
adoption under that section.

ID.—RECEPTION INTO FAMILY OF UNMARRIED MAN.—The fact that the
father of the illegitimate child is an unmarried man, and has no
family, except the illegitimate child, does not authorize the provision
of the code in that respect to be dispensed with; but he must re-
ceive him, and cannot send him elsewhere; and if he have a home or
place of residence into which he can receive him, he must receive
him there as an indispensable condition of adoption, under section
230 of the Civil Code.

ID.—PUBLIC ACKNOWLEDGMENT OF CHILD.—A document signed in the
presence of witnesses, declaring that a person, named and described
as then living, as a foster son, with a physician named, and with the
latter's family, who was the illegitimate child of a mother named,
was his own son, and was made his sole and lawful heir, though a
good acknowledgment to make him the heir of the person acknowl-
edging him, under section 1387 of the Civil Code, falls short of an
adoption under section 230 of that code.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco.   J. V. Coffey, Judge.

The facts are stated in the opinion of the court.

Timothy J. Lyons, Garret W. McEnerney, and E. S. Pillsbury, for Appellants.

J. J. Dwyer, Garber, Creswell & Garber, and Thomas F. Barry, for Respondents.

VAN DYKE, J.—This appeal is from a decree of final distribution of "the residue of the estate" of José Vicente de Laveaga, deceased. The appeal is taken by Maria Josefa Cebrian, Maria C. de Laveaga, and Miguel A. de Laveaga, who were, respectively, the two sisters and the brother of said decedent. The said decree distributed said "residue" of said estate among said three appellants and the respondent Anselmo J. M. de Laveaga. The appeal is not taken from the whole of said decree, but only in so far as it adjudges that the respondent Anselmo J. M. de Laveaga is entitled to one-fourth part of said "residue" thereby distributed, or to any other part thereof, or to any interest at all.

Although the record in this case is very voluminous, and the printed argument of counsel on the respective sides quite elaborate and also voluminous, the questions involved are reduced to two propositions. These, as stated by the appellant, are: First, whether under section 1387 of the Civil Code, to be found in the title on "succession" to estates, it is possible for an illegitimate child to inherit from a collateral kin, except in the event of the marriage of his parents and his adoption into the family created by that marriage. The section in question reads as follows: "Every illegitimate child is an heir of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child; and in all cases is an heir of his mother; and inherits his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock; but he does not represent his father or mother by inheriting any part of the estate of his or her kindred, either lineal or collateral, unless, before his death, his parents shall have intermarried, and his father, after such marriage, acknowledges him as his child, or adopts him into his family; in which case such child and all the legitimate children are considered brothers and sisters, and on the death of either of them, intestate, and without issue, the others inherit his estate, and are heirs, as here-

inbefore provided, in like manner as if all the children had been legitimate; saving to the father and mother respectively their rights in the estates of all the children in like manner as if all had been legitimate. The issue of all marriages null in law, or dissolved by divorce, are legitimate." The second point upon which the appellant relies is, that the respondent was never legitimated or adopted under section 230 of the Civil Code, which section reads as follows: "The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption." On the other hand, it is contended that the respondent was adopted under the provisions of section 230 of the Civil Code, and as such entitled to inherit through his deceased father, the brother of the decedent whose estate was distributed, and in which this appeal is taken. The case was tried before the court without a jury, and the court found, among other matters, that the respondent was the illegitimate child of José Maria de Laveaga by one Basilia Sanchez, who was a servant in the household of the father of said José Maria, and was living therein in the city and county of San Francisco at the time respondent was begotten. But before his birth his mother, said Basilia Sanchez, removed to the city of Mazatlan, in Mexico, where he was born. "That said José Maria de Laveaga and said Basilia Sanchez were never married; that the said Basilia Sanchez was never married; that the said José Maria de Laveaga was never married, and had no family except his said child, Anselmo José Maria de Laveaga; that the said Anselmo José Maria de Laveaga was born illegitimate and was born the illegitimate child of said José Maria de Laveaga"; that after the death of his mother, Basilia Sanchez, said respondent, then a child, was brought to San Francisco, in September, 1873, and was received here and taken in charge by his father, said José Maria, who placed him under the care of Dr. Wilhelm Dohrmann, and paid for his support and education in the family of said Dr. Dohrmann, "and thence continuously until his own death, said José Maria de Laveaga took said Anselmo José de Laveaga into his cus-

tody and control and under his protection in said state of California, and till his own death did continue to have and exercise the same in said state of California over said Anselmo José Maria de Laveaga as the father of said Anselmo José Maria de Laveaga and in a fatherly manner, and did receive the said child, Anselmo José Maria de Laveaga, into his said family as his own child, and from on or about the 20th day of September, 1873, thereafter until his death as aforesaid, said José Maria de Laveaga caused said Anselmo José Maria de Laveaga to be cared for, nurtured, maintained, reared, and educated in said city and county of San Francisco by said Dr. Wilhelm Dohrmann, . . . and said Dr. Dohrmann with his wife acted by the direction, consent, request, and procurement of said José María de Laveaga as the foster parents''; that said José Maria de Laveaga having no family except as aforesaid, did to his acquaintances, friends, associates, kindred, and other persons publicly acknowledge and declare the said Anselmo José Maria de Laveaga to be his own child and son; ''that from and after the said arrival of said boy Anselmo in said city and county and until his own death, said José Maria de Laveaga had in said city and county of San Francisco certain kindred, to wit, parents, brothers, sisters, and other collateral kindred, and they resided therein from the date of said boy's arrival in said city and county continuously thereafter until said José Maria's death, with the exception that his father died on March 14, 1874, and into and among said kindred said José Maria de Laveaga did receive the said child, Anselmo José Maria de Laveaga, as his own child, and did not deny to said kindred, or to any of them, that the said child was his child, or his own child, or that he was the father of the said child. . . . And did otherwise treat said Anselmo José Maria de Laveaga as if he were a legitimate child of said José Maria de Laveaga, and did thereby adopt said Anselmo José Maria de Laveaga as and for his legitimate child, and did legitimate said Anselmo José Maria de Laveaga, and thereby said Anselmo José Maria de Laveaga became for all purposes the legitimate child of said José Maria de Laveaga from the time of the birth of the said Anselmo José Maria de Laveaga.''

It is also found that said José Maria de Laveaga left a so-called will, in the words and figures following, to wit:—

CXLII. Cal.—11

"In the name of God, amen. I, José M. de Laveaga, of Los Aguilas Ranch, San Benito County, state of California, of the age of 33 years 1 mth & 27 days, and being of sound and disposing mind, and not under any restraint, or the influence or representation of any person whatever, do make, publish and declare this my last will and testament, in manner following, that is to say:

"First. I direct that my body be decently buried without undue ceremony or ostentation; but with proper regard to my station and condition in life, and the circumstances of my estate.

"Secondly. I direct that my executors hereinafter named, as soon as they have sufficient funds in their hands, pay my funeral expenses, and lawful debts.

"Thirdly. Whereas all my kindred and relations are in good and easy circumstances, I herewith distinctly declare that I not give, bequeath, nor devise anything to any of my kindred or relatives however near; with the exception of my brother José Vicente, and this only in below specified case; but give, bequeath, and devise all of my property to my son Anselmo José Maria, born in Mazatlan, Mexico, to Basilia Sanchez, deceased, on the 21st day of April, 1868, and to-day residing with Doctor Wm. Dohrmann at No. 535 Bryant St. corner of Zoe, to the exclusion of all and everybody else, as this is the only child, I swear before God and men to have.

"Fourthly. I wish to have it understood, that said Anselmo José Maria, will not enter into possession of anything now belonging to me, before he reaches his full age, and has learned some profession, for which purpose the executors hereinafter named will give him a thorough education.

"Fifth. In case of death of said Anselmo José Maria, all of my estate goes to my brother José Vicente de Laveaga.

"Lastly. I hereby appoint my said brother José Vicente de Laveaga and my friend Frederick W. Dohrmann (of the firm of B. Nathan & Co.) both of the city of San·Francisco, California, the executors of this my last will and testament; hereby revoking all former wills by me made.

"In witness whereof, I have hereunto set my hand and seal this 8th day of November in the year of our Lord one thousand eight hundred and seventy-seven.

"J. M. de Laveaga.   (Seal.)

"The foregoing instrument, consisting of one page besides this, was, at the date thereof, by the said José M. de Laveaga signed and sealed and published as, and declared to be his last will and testament, in presence of us, who, at his request, and in his presence, and in the presence of each other, have subscribed our names as witnesses thereto.

"A. M. ABREGO, Residing at Los Aguilas.

"GREEN DEVAUL, Residing at Los Aguilas."

It is further found that another instrument in writing in the German language was executed by said José Maria de Laveaga in his lifetime, of which the following was a translated copy:—
                              "Done
          "San Francisco, California.  May 24th Anno 1878.

"By these presents and by my name, hereunto subscribed with my own hand, I, Joseph Maria de Laveaga, before and in the presence of the witnesses whose names have been likewise hereunto subscribed with their own hands, and being in the full possession of my intellect and in good health, (having come here temporarily from my rancho, Los Aguilas, San Benito County,) do truthfully and solemnly declare:

"That the boy, born at Mazatlan in Mexico on April 21st Anno 1868, therefore at present 10 years old, named Joseph Anselm Sanchez, who, since September 20th of the year 1873, has been, and is now, living as a foster son with Wilhelm Dohrmann, M. D., engaged here in medical practice, and with the latter's family, is my own son, and is hereby acknowledged as such by me, his own true father, before these witnesses orally and in writing, just as I have already after the death years ago of his own mother, Basilia Sanchez, by means of a testamentary disposition (that is, to say, years ago) made him my sole and only lawful heir of the estate to be left by me, and I hereby repeatedly acknowledge and confirm him with all his legal claims of inheritance and other rights and consequences connected with and in law and justice arising out of this my acknowledgment, which an own son may have.

"Whereof this preliminary instrument is witness (viz. of this my act of acknowledgment) (and at the same time of the previous testamentary disposition as to the inheritance of my estate) amongst the living and in case of death, reserving com-

pliance with the further formality, if required by law, of a proper notarial instrument and other like things, which owing to the absence of the notary public, Mr. E. V. Sutter, of this city, will be effected and regularly done in addition hereto after his return.

"Thus done and subscribed, under date and in the year, as above, on May 24th, 1878.            J. M. DE LAVEAGA."

"As witnesses and for the genuineness of the above signature:

"F. A. SCHRODER,
"WILHELM DOHRMANN,
"Dr. M."

And it is further found that the said will of José Maria de Laveaga was admitted to probate December, 1895. That by reason of the premises the court concludes that the said Anselmo José Maria de Laveaga is one of the four heirs at law next akin of the testator, José Vicente de Laveaga, and is entitled to one fourth part of the residue of his estate.

The findings of the court to the effect that the respondent was adopted by José Maria de Laveaga are challenged by the appellant, as being unsupported by the evidence.

From the evidence the following appear to be the facts of the case. In 1867 the family of the elder de Laveaga moved from Mazatlan to San Francisco. He was a banker, and possessed of considerable means. He had three sons and three daughters. One son, José Maria de Laveaga, and three daughters came with the family. Miguel A. de Laveaga, one of the sons, and an appellant herein, was at the time at school in Germany, and the other son, José Vicente, whose estate is now under consideration, came up subsequently. With the family two sisters of the mother and several servants also came. Among the servants was Basilia Sanchez, claimed to be the mother of the respondent by José Maria de Laveaga, who was at that time twenty-two or twenty-three years of age, and the said Basilia Sanchez about twenty-five years of age. After remaining in San Francisco about three months, this Basilia Sanchez, in the fall of 1867, the same year in which they arrived here, returned to Mazatlan, where she gave birth to the respondent, as already stated, April 21, 1868. She died in Mazatlan in May, 1872. The respondent was brought from Mazatlan to San Francisco September 20, 1873, when he was

about five years of age, and was taken by José Maria de La-
veaga to the house of Dr. William Dohrmann, a German phy-
sician, who lived at 535 Bryant Street, in San Francisco. At
this time, and for some time prior thereto, said José Maria was
a clerk with T. Lemmen-Meyer & Co., a house in this city then
doing a large South American business. He continued to be
a clerk in that house until his father's death in 1874. The
respondent, from the time he arrived here, remained a mem-
ber of Dr. Dohrmann's household, for fourteen or fifteen years,
with the exception of some short absences. In 1874, the year
following the arrival of respondent to San Francisco, the elder
de Laveaga died, leaving an estate of the value of from one
million five hundred thousand dollars to two million dollars.
José Maria de Laveaga inherited seventy-five thousand dollars
from his father. This inheritance he received in 1874 and
1875, and in June, 1875, he purchased twenty-three thousand
acres of land at Hollister, San Benito County, called Los
Aguilas Ranch, and took up his residence there in 1875 or
1876. He remained on said ranch until 1879, in the mean
time making occasional trips to San Francisco, and then re-
turning again to his ranch. In the latter year, being finan-
cially embarrassed, he conveyed the said ranch to his mother,
who paid the mortgage that had been given thereon. José
Maria then departed on a visit to Colorado, where he died
April 21, 1880, at which time respondent herein was twelve
years of age. In July, 1874, the year following the arrival
of the respondent from Mazatlan, he was entered as a pupil
in the German-American School in San Francisco as Joseph
Sanchez, and continued a pupil therein until and including
July, 1875. In September, 1875, his name was changed to
Joseph Dohrmann, and he continued a pupil in the German-
American School under that name until 1877, at which time
he was entered as a pupil in the South Cosmopolitan Grammar
School of San Francisco under the name of William Dohr-
mann, and continued under that name to be a pupil of that
school for a year. On October 21, 1878, he entered the Lin-
coln Grammar School under the name of William Dohrmann,
and continued a pupil therein until and including May 28,
1881. He was thus a pupil in a private school and in two pub-
lic schools in the city and county of San Francisco from the
time he was six years of age until after the death of his father

under the name of Dohrmann. His Christian name, as first given, was Joseph, but it seems it was subsequently changed to William, perhaps from the fact that the name of Dr. Dohrmann was William. In October, 1881, he was registered in a school under the name of William Dohrmann, and as a German, and a Protestant. On June 30, 1882, he sailed as a cabin-boy in the ship Willie Reid for an eleven-month voyage to Wales and Ireland, and returned home to San Francisco, May 31, 1883. He was registered in that ship, as the custom-house records showed, as "William J. Dohrmann," and in 1887 he is found in the directory of San Francisco as "Joseph Dohrmann," a machinist, living at 535 Bryant Street, which, as appears, was the number of Dr. Dohrmann's residence. Mrs. Paulsen, a daughter of Dr. Dohrmann, deceased, called as a witness on the part of the respondent, testified that the respondent was everywhere known as and called Dohrmann; that she objected to his being called Dohrmann, not only to her own father, but to José Maria, his real father, and that José Maria said circumstances prevented the boy from taking his own name, which he would take in due season, and she testified also that her father, Dr. Dohrmann, grew quite angry and was displeased at the idea that he should be called de Laveaga or Laveaga, and not continue to be called Dohrmann. In the will of José Vicente de Laveaga, whose estate is here involved, respondent is referred to as "José Maria Dohrmann, a Mexican boy, adopted *de facto* by and at Wm. Dohrmann's house." In 1895 respondent filed a petition for partial distribution to him of a legacy of twenty thousand dollars in the present estate, and appellants herein resisted the petition of partial distribution on the ground that by the will the Los Aguilas Ranch, which at that time belonged to the testator, was bound for the payment of all legacies, and that the proceeds of the ranch were insufficient to pay the legacies in full. The lower court granted the petition for payment of the legacy in full, but on appeal that decree was reversed by this court. (*Estate of De Laveaga,* 119 Cal. 651.) In the clause of the will in reference to the legacy it is provided that, "the income and dividends of 200 shares to José Maria Dohrmann, a Mexican boy, adopted *de facto* by and at Wm. Dohrmann's house," and on the hearing of the petition for partial distribution the respondent testified that he was the individual men-

tioned by the name of Dohrmann, that he was everywhere
known as and called Dohrmann, and that he did not know that
he was a de Laveaga until the year before the death of Dr.
Dohrmann, which occurred in 1886.   It appears, therefore,
from respondent's own testimony in that proceeding for par-
tial distribution in this same estate that up to five years after
the death of José Maria de Laveaga, his real father, he did not
know that he was a de Laveaga.   He there says: "I did not
know any better," and upon the hearing from which this ap-
peal was taken he was asked about the writing of three letters
to Dr. Dohrmann and his wife, wherein he addressed them as
"Dear father and dear mother," and subscribed himself as
"Your loving son," and he was asked why he permitted him-
self to be called "Dohrmann," and said, "I did not know any
better," and further testified that a year before Dr. Dohr-
mann's death the doctor told him that his name was not Dohr-
mann but de Laveaga, and that that was the first information
he had upon the subject.   Dr. Dohrmann kept what is known
in the record of the proceedings as "Joseph's Book,"—giving
a history of the respondent,—which book opens with these
words, "Joseph Anselm Sanchez (Dohrmann) . . . came to
us his foster parents in San Francisco Sunday afternoon, the
20th of September, 4 o'clock P. M., A. D. 1873, 5 years 5 months
old." Dr. Dohrmann claimed throughout his life that he and
his wife were foster parents to the respondent, and the latter,
as shown, bore their name, and was also known in the differ-
ent schools under that name.   José Maria de Laveaga, from
the time he purchased the Los Aguilas Ranch, in 1875 or 1876,
to 1879, resided on said ranch.   He had a ranch house con-
sisting of three rooms, and had hands employed on the ranch,
one of whom had a family, and made that his home for three
or four years, yet he never received the respondent under his
roof.   And further, he was never received in the family of the
father of José Maria, nor is there any evidence that he ever
entered their house or was received or recognized by any of the
members of his father's family.   In fact, it appears from the
evidence that when his intrigue with the servant girl was
discovered José Maria left his father's house in anger and for
good, and that he never returned and slept in his father's
house afterwards.   But it seems, however, that the relations of
affection between José Maria and his parents did not cease, as

the numerous letters produced at the trial written by him would show, and they also show that in none of them was any reference ever made to the respondent in this case. In fact, it seems to have been his studied purpose not to refer to or introduce the subject of his illegitimate child in his intercourse or correspondence with his parents.

The will of José Maria, set out in the findings above, remained in the possession of José Vicente, his brother, until after the latter's death, when it was found among his effects and probated, as already stated. This, therefore, could not have been any public acknowledgment. In fact, respondent's counsel complain that the will was suppressed and kept from the public by José Vicente while he lived.

The other document signed by José Maria de Laveaga, and witnessed by F. A. Schroder and Dr. Dohrmann, and said to have been drawn up by Dr. Dohrmann, simply declares that the respondent here is his own son, born at Mazatlan in Mexico, and that his mother was Basilia Sanchez, and that he "is now living as a foster son with Wm. Dohrmann, M. D. . . . and with the latter's family." This is a good acknowledgment of an illegitimate child so as to make him the heir of the person acknowledging him under section 1387 of the Civil Code, but falls far short of an adoption under section 230 of the Civil Code. But section 1387 of the Civil Code, however, does not aid respondent in this case, for, by its express terms, he does not represent his father by inheriting any part of the estate of his kindred. The court finds that José Maria de Laveaga had no family except his said child, but, as shown by the evidence, his said child never lived with him anywhere, either on his ranch or while he was a clerk in the city of San Francisco or elsewhere. It is true that he paid for his support and education in the family of Dr. Dohrmann up to the time of his own death, and that his brother José Vicente thereafter, up to his death, did contribute something towards the support and education of the respondent. But José Maria never received him into his family, or into or among his kindred, and did not treat the respondent as if he were a legitimate child, but, on the contrary, treated him and referred to him as an illegitimate child. The findings of the court in the premises are not supported by the evidence, and the conclusion that "thereby said Anselmo José Maria de Laveaga became for all purposes

the legitimate child of said José Maria de Laveaga from the time of the birth of said Anselmo José Maria de Laveaga'' is contrary to law. The court below seems to have acted upon the theory that where the father of an illegitimate child has no family the provision of the code in question in that respect may be dispensed with. This cannot be done. The legislature adopting section 230 evidently went as far as public policy would justify in this respect, and the language is too plain to be misunderstood. The father of an illegitimate child in order to adopt him as legitimate must not only publicly acknowledge him as his own, but must receive him into his family, and if he have a wife, with her consent. It does not say that he must receive him into his family if he has a family, and if not, in that case can receive him or send him elsewhere; but having a family, or at least a home, in which he can receive him is one of the cardinal conditions prescribed for such adoption.

There is no former decision of this court which can be taken as authority against the views above expressed, although some expressions of individual justices adverse to those views may be found. *In re Jessup,* 81 Cal. 408, is the only case where an opinion concurred in by a majority of the court has intimated any contrary views; but in that case what was intimated, although not clearly expressed, on the subject was unnecessary to the decision. Moreover, the opinion was concurred in by only four of the justices, one of whom afterwards expressed dissatisfaction with it, declaring that it was, so far as the question here involved is concerned, mere *dicta,* and said: ''I concurred in the opinion; but as I was thoroughly convinced that the facts in the case did not bring it within the code, under any possible construction of it, I must have failed to consider as thoroughly as I should have done the views above referred to. Upon mature deliberation I am satisfied that they are wrong.'' (See *Blythe* v. *Ayres,* 96 Cal. 593.) Under these circumstances *In re Jessup* cannot be taken as an authority on the subject in any way controlling. In *Blythe* v. *Ayres,* 96 Cal. 557, in an opinion by one of the justices, there were views expressed contrary to those above stated; but these views were unnecessary to the decision of the case, and, moreover, were concurred in by only two of the other justices. Justice McFarland, whose concurring opinion was

signed by Justice De Haven, concurred in the judgment on the ground that the plaintiff therein was heir of the deceased under section 1387 of the Civil Code, but says: "I dissent from the proposition that plaintiff was adopted by deceased under section 230. . . . How can there be a compliance with a statute in the absence of conditions contemplated by the statute, and absolutely necessary to give it effect? The provision of the code in question assumes the existence of a family; and it assumes that there may be a family in which there is no wife, because it provides that if there be a wife she must consent to receive the illegitimate child into the family. . . . There must, however, be a family into which the child can be received; and when that condition is not present, the provision of the code under discussion can have no operation." In Garner v. Judd, 136 Cal. 394, cited by respondent, the question here involved was not before the court, and was not considered.

With lax laws on the subject of divorce, and the lax administration of such laws, it only requires that all distinction between legitimates and illegitimates be abolished to practically abolish also the marital relation, and thus destroy the home, with all its hallowed associations. Society itself is but the aggregation of families, and to the extent that we weaken the family tie we sap the foundation of society. The history of mankind fortunately illustrates that no laws of any people have ever attempted to abolish all distinctions between legitimate and illegitimate children. For a brief period in the terrible history of the French Revolution an innovation in a limited sense was attempted, and in reference to this innovation Chancellor Kent says: "In June, 1793, in the midst of a total revolution in government, morals, and laws, bastards, duly recognized, were admitted to all the rights of lawful children. But the Napoleon code checked this extreme innovation." (4 Kent's Commentaries, 415.) That the marriage relation is the foundation of all society has been so frequently expressed by this court that it is entirely unnecessary to refer to the cases wherein it is so held. Courts of other jurisdictions, it may be said, have also uniformly so decided. In *Reynolds v. United States*, 98 U. S. 145, the supreme court of the United States, passing upon the anti-polygamy legislation, says: "Marriage, while from its very nature a sacred obligation, is

nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal.'' In *Murphy* v. *Ramsay*, 114 U. S. 15, it is said by the same court: ''Certainly no legislation can be supposed more wholesome and necessary in the founding of a free, self-governing commonwealth, fit to take rank as one of the co-ordinate states of the Union, than that which seeks to establish it on the basis of the idea of the family, as consisting in and springing from the union for life of one man and one woman in the holy estate of matrimony; the sure foundation of all that is stable and noble in our civilization, the best guarantee of that reverent morality which is the source of all beneficent progress in social and political improvement.'' Also by the same court, in *Maynard* v. *Hill*, 125 U. S. 190, speaking of marriage, it is said: ''It is an institution in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress.'' As already said, the legislature in adopting section 230 of the Civil Code has gone as far as public policy will justify, and the court does not feel inclined—even if it had the right so to do—to go beyond the plain language of the law declared by the legislature in this respect.

Our conclusion from the foregoing, therefore, is, that the respondent was never adopted so as to be deemed a legitimate child of José Maria de Laveaga as required by section 230 of the Civil Code, and therefore is not entitled to inherit any part of this estate. Whether, according to the provisions of section 1387 of the Civil Code it is possible for an illegitimate child to inherit from a collateral kin, except in the event of the marriage of his parents, and his adoption into the family created by that marriage, as contended by appellant, it is not necessary here to determine.

The portion of the judgment and decree appealed from is reversed and the cause remanded for further proceedings in accordance with this opinion.

McFarland, J., Henshaw, J., Shaw, J., Angellotti, J., and Lorigan, J., concurred.

A rehearing was denied, upon which Beatty, C. J., delivered the following opinion, March 11, 1904:—

BEATTY, C. J.—For want of time, I have never been able to make such an examination of the voluminous record and printed arguments in this case as would warrant me in saying that the judgment of the superior court is free from error, but the denial of respondent's petition for a rehearing gives me occasion to say that, so far as the opinion of the court may seem to imply that the evidence does not sustain the findings of the trial judge to the effect that respondent's father did publicly acknowledge him as his own child, and treat him as if he were legitimate, it is not, in my opinion, sustained by the record. There is not only sufficient evidence, but, I think, strongly preponderating evidence, in support of these findings. The principal ground of the decision, however, as I understand the opinion of the court, is the failure of his father to receive the respondent into his family, and in connection with this point it is held that reception into the family of the father is an indispensable condition of legitimation under section 230 of the Civil Code, rendering it impossible for a father who is without a family and without a home to confer the *status* of legitimacy upon a child born out of wedlock.

The contrary was held in the Jessup case, and it was a point *decided,* and not, as stated in the opinion of the court, *obiter dictum.* The effect of the decision in that case was to remand the cause for a new trial, and it was the duty of the court to decide the questions which must necessarily arise upon the new trial, one of which was the proper construction of section 230 as to the possibility of legitimation in the case of a father without a family and without a home. Neither was the decision then made upon this point concurred in by a bare majority of the court. The four justices who signed Justice Fox's opinion awarding a new trial, necessarily concurred in what he said, and, *a fortiori,* the three justices who dissented from the judgment have concurred on this point, for it was absolutely essential to an affirmance of the judgment to hold that where the father has no family and no home he is not by that circumstance deprived of the power to confer the *status* of legitimacy upon his illegitimate offspring.

It is possible, notwithstanding the mature consideration

given to the Jessup case, that the court may have been in error in applying the principle of liberal construction to the statute, instead of construing it strictly and literally, as it is construed here; but I cannot concur in a reversal of that case, which is put upon the untenable ground that the point was not decided, and that the so-called *dictum* of the court was concurred in by a bare majority of the justices.

Under the circumstances I think the case deserved further consideration.