RICHMOND, Respondent, vs. TAYLOR, Administrator, and another, Appellants.

*December 12, 1912—January 7, 1913.*

*Descent and distribution: Heirship: Evidence: Illegitimates: Acknowledgment of paternity: Form and requisites: Conflict of laws: Domicile.*

1. In a proceeding to determine heirship a finding by the circuit court that one M. (who was born in slavery) was not the daughter of the decedent is *held* erroneous, it appearing that for over forty years and up to the time of his death (excepting only a period of misunderstanding between them after she had come at his request to keep house for him in this state) the decedent had always spoken of and acknowledged her as his daughter, and there being other corroborative evidence, while the only doubt cast upon her paternity was the testimony of two aged women, one of them white, given forty-six years after the event, as to the date of her birth.

2. The written acknowledgment of paternity provided for in sec. 2274, Stats. (relating to the heirship of illegitimates), need not have been made for the express purpose of establishing heirship or of complying with the statute, if it does in fact meet the statutory requirements.

3. Such an acknowledgment need not be in precise, formal language, but is sufficient if it appears with reasonable clearness and certainty from the written words that the paternity of the child is acknowledged.

4. The law of the domicile of the person making the acknowledgment, and not that of the domicile of the child or mother, governs the question of legitimation.

5. Where, in a written application to the government for a pension, signed in the presence of a competent witness, the applicant declared a certain person to be his daughter, in such terms and under such circumstances as to exclude inadvertence or mistake, this was a sufficient acknowledgment of paternity under sec. 2274, Stats., to constitute such person his heir, assuming her to have been his illegitimate child. [Whether if she was not his child she would be entitled to inherit, not determined.]

APPEAL from a judgment of the circuit court for Grant county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

This action was begun originally in the county court of Grant county as a proceeding to determine heirship in the estate of Thomas Richmond, deceased. The administrator of the estate in his petition for the settlement thereof alleged on information and belief that the deceased left him surviving *Martha Richmond,* a daughter, his only child and sole heir at law, but that her right to the estate was denied by *Henry Richmond,* who claimed to be a brother of deceased. Upon the hearing in the county court *Henry Richmond* denied her right as heir and claimed that, as a brother of deceased, he was entitled to one half of the estate.

The county court found that *Martha Richmond* was the child and sole heir at law of the deceased and entitled to inherit the entire estate. *Henry Richmond* appealed from the judgment of the county court to the circuit court for Grant county. The last named court found that *Martha* was not the child of Thomas Richmond, and that any acknowledgment of her by him as his daughter was made by mistake as to her paternity. It further found that the deceased left him surviving as his heirs at law *Henry Richmond,* the respondent, and Peter Richmond, his brother, and wholly reversed the judgment of the county court. From such judgment of reversal the administrator and *Martha Richmond* appealed.

For the appellants there was a brief by *Brown, Brennan & Carthew,* and oral argument by *H. E. Carthew.* They argued, among other things, that the statute makes the written acknowledgment the only permissible proof of paternity; and that it may consist of any collateral writing and need not be made for the purpose of legitimation. *In re Rohrer,* 22 Wash. 151, 60 Pac. 122; *In re Gorkow's Estate,* 20 Wash. 563, 56 Pac. 385; *Blythe v. Ayres,* 96 Cal. 532, 31 Pac. 915; *In re Jessup's Estate,* 81 Cal. 408, 22 Pac. 743; *Binns v. Dazey,* 147 Ind. 536, 44 N. E. 644; *In re Pederson's Estate,* 97 Minn. 491, 106 N. W. 958; *Crane v. Crane,* 31 Iowa, 296; *Lind v. Burke,* 56 Neb. 785, 77 N. W. 444; *Brown v. Iowa*

*Legion of Honor,* 107 Iowa, 439, 78 N. W. 73; *Thomas v. Thomas' Estate,* 64 Neb. 581, 90 N. W. 630; *Moen v. Moen,* 16 S. Dak. 210, 92 N. W. 13; *Brock v. Stale,* 85 Ind. 397; *In re De Laveaga's Estate,* 142 Cal. 158, 75 Pac. 790; *Mund v. Rehaume,* 51 Colo. 129, 117 Pac. 159; *Miller v. Pennington,* 218 Ill. 220, 75 N. E. 919, 1 L. R. A. N. s. 773; *Grant v. Mitchell,* 83 Me. 23, 21 Atl. 178; and other cases. A competent witness need not be a subscribing witness. *Blythe v. Ayres, supra; In Pederson's Estate, supra; Grant v. Mitchell, supra.* The law of the father's domicile governs legitimation. *Blythe v. Ayres, supra; Moen v. Moen, supra.* The testimony in the case establishes a valid slave marriage. *Lee v. Lee,* 161 Mo. 52, 61 S. W. 630; *U. S. v. Route,* 33 Fed. 246; *Hardin v. Hardin* (Ky.) 87 S. W. 284; *State v. Bittick,* 103 Mo. 183, 15 S. W. 325; *Lindsey's Devisee v. Smith,* 131 Ky. 176, 114 S. W. 779; *Thompson v. Nims,* 83 Wis. 261, 53 N. W. 502.

For the respondent there was a brief by *R. A. Watkins* and *Geo. B. Clementson,* and oral argument by *Mr. Watkins.* They contended, *inter alia,* that strict proof of parentage must.be furnished independent of the acknowledgment. *In re Jessup's Estate,* 81 Cal. 408, 435, 22 Pac. 743; *Blythe v. Ayres,* 96 Cal. 532, 589, 31 Pac. 915; *In re Gorkow's Estate,* 20 Wash. 563, 56 Pac. 385. In this case there was no sufficient writing. *Lind v. Burke,* 56 Neb. 785, 77 N. W. 444; *Moore v. Flack,* 77 Neb. 52, 108 N. W. 143; *Grant v. Mitchell,* 83 Me. 23, 21 Atl. 178.

VINJE, J. Appellants contend the evidence shows (1) that *Martha* was born in wedlock; (2) if not, that she is the illegitimate child of Thomas Richmond; and (3) that he sufficiently acknowledged her in writing to be his child to entitle her to inherit.

It appears from the evidence that Thomas Richmond was born a slave in Randolph county, Missouri, near College

Mound, on the farm of Samuel Richmond, who owned his parents, John and Queen Richmond. They lived together in a separate cabin and continued to be the slaves of Samuel Richmond until slavery was abolished in Missouri about January 1, 1865. Thomas was upon the Richmond place as a slave from the time of his birth until he left, about January 30, 1864. Margaret, a daughter of Samuel Richmond, married one Caswell Smith, and they lived upon a farm adjoining the Richmond place. One of the slaves owned by Caswell Smith was Sarah, who was known by the name of Sarah Smith. Caswell Smith inherited her from his father, who lived in North Carolina, and she was brought to Missouri some ten years before the war. She was then grown and had a child who afterwards died. After coming to Caswell Smith's place she had a girl child, a mulatto, who died when three or four months old. Her next child was a boy, colored, named William, who died about 1870; her next child was a girl, colored, named Adeline, who died about 1890; and her next child, was a girl, *Martha,* colored, who is one of the appellants in this case. The date of her birth is in dispute, and is variously testified to as having been as early as 1863 and as late as 1865. About January 30, 1864, Thomas Richmond ran away from the Samuel Richmond place and went to Macon, about twenty miles distant, and on January 31st enlisted for three years in the Union army. He was mustered into service at Benton Barracks, St. Louis, on February 8, 1864, and was discharged June 14, 1865. According to his discharge he was then twenty-five years of age. Thomas Richmond frequently visited Sarah Smith and had intercourse with her, certainly as late as January 30, 1864. Sarah, however, never assumed the name of Richmond, but up to the time of her death at Macon, Missouri, about 1886, was known only by the name of Sarah Smith. *Martha,* now called *Richmond,* up to the time she came to Wisconsin in 1891 was known by the name of *Martha Smith.* After Thomas Richmond's discharge from the Union army he worked in St.

Louis and in Illinois, and came to Grant county, Wisconsin, in 1866 or 1867, and continued to reside there until his death in 1909. Most of the time he lived on a small farm in the town of Beetown, near Lancaster, but some of the time he lived in Lancaster. A few years after Thomas settled in Grant county, and about 1871 or 1873, he went back to Missouri to bring his father and mother to Wisconsin, and did so. From statements he made before he went it seems he contemplated bringing with him Sarah Smith also. When he went into the army she had two children living, William and Adeline, of whom Thomas spoke as his own; he also spoke of Sarah as his wife. He found, however, when he returned to Missouri that, besides *Martha,* there had been born to Sarah two other children, one known as Sam Oliver and the other called Bob. He did not bring Sarah with him to Wisconsin. From the time the parents of Thomas came to Wisconsin they lived with him on his farm near Lancaster. In 1891, his mother becoming feeble and desiring to have assistance for her in the house, he, through others, as he could neither read nor write, sent several letters to *Martha* requesting her to come to Wisconsin and live with them. Only one of these letters, which was written by Mr. John Carthew, has been preserved. It reads as follows:

"LANCASTER, Wis., Sept. 19—91.
*"My Dear Daughter:* Your letter of the 2nd of this month duly came to hand. I have been so very busy could not answer before. I am first rate but mother is not so very well. You speak of coming on railroad. You had better come on to Cassville, Grant Co., Wis., on the C. B. and Northern and I will meet you there if you will send me a letter a week ahead what day you will start or when you will arrive at Cassville. Hoping you are all well and will come all safe soon, I am,        Your affectionate father,
"THOMAS RICHMOND."

The envelope in which this letter was sent has not been preserved, and Mr. Carthew cannot swear positively to what ap-

peared thereon.    Mr. John Mankel and Mr. N. H. Suttle also wrote letters to *Martha* for Thomas about the same time. Each testifies that he cannot remember the contents of the letters except that they concerned *Martha's* coming to Wisconsin. The recollection of the witnesses is that said letters began "Dear Daughter" or "Dear Daughter Martha" and that they were signed "Your father, Thomas Richmond."

*Martha* came to Grant county in 1891 and lived upon the Richmond place with Thomas for eight or nine years, when a difference between them arose and she went to Lancaster and worked out for a while, during which time she occasionally visited him on his farm.    She then went back to the farm for a short time, but afterwards went to South Dakota, and from there to Phœnix, Arizona.    Some weeks before Thomas died, and while he was sick, he sent money to her to pay for her return to Wisconsin, and she came back and was with him during the last two weeks of his life.    He died June 22, 1909, leaving an estate inventoried at about $5,000.    He left surviving him two brothers, *Henry Richmond,* the respondent, and Peter Richmond.

Thomas Richmond was a pensioner of the United States. Under date of January 15, 1898, the pension bureau at Washington sent to him certain questions to be answered and to be returned with his next quarterly voucher to the pension agents at Milwaukee.    He signed the paper by mark under date of July 5, 1898, and answered some of the questions.    To the question, "Are you married?    If so, please state your wife's full name and her maiden name," the answer given was, "No. Wife is dead.    Maiden name was Sarah Smith.    Died in Macon City, Missouri, in the year 1868, as near as I can remember." To the question, "When, where, and by whom were you married?" no answer was given.    To the question, "Have you any children living?    If so, please state their names and the dates of their birth," the reply was "Yes, *Martha Richmond.*    I think she was born in the year 1865."

These statements were made out for Richmond by one W. E. Webb, in whose presence they were signed. The date of Sarah Smith's death should have been given as 1886 instead of 1868. How the mistake occurred does not appear.

The trial court found that *Martha Richmond* is not the child of Thomas Richmond, and that any acknowledgment of her as his daughter made by Thomas was made through his mistake as to her paternity. The trial judge evidently based his findings upon the truth of the testimony contained in the depositions of Margaret Smith and Margaret E. Terry, both of whom testified that *Martha* was born in December, 1864. It is a verity in the case that Thomas Richmond left the Samuel Richmond place about the last of January, 1864; that he joined the service at Macon, Missouri, January 31st, and was mustered in February 8th at Benton Barracks, St. Louis. If it be a fact that *Martha* was born in December, 1864, and that, as found by the trial court, Thomas did not have access to or intercourse with Sarah Smith later than January 30, 1864, then it follows that *Martha* is not the child, legitimate or illegitimate, of Thomas Richmond. If, however, *Martha* was born before Thomas Richmond went into the army, as testified to by Milly Smith, or if Thomas Richmond had intercourse with Sarah after he joined the army, or if *Martha* was born on or before November 1, 1864, then the basis upon which the trial judge made his findings falls. Macon, at which place Richmond joined the army, was only twenty miles from the Samuel Richmond place. While the testimony is to the effect that he was not seen in or about the Richmond neighborhood after he left it to join the army, still it cannot be said to be an absolute verity that he did not return during his term of service. It is also apparent from the testimony of Margaret Smith and Margaret E. Terry that their recollection of the birth of *Martha* as occurring in December, 1864, was vague and unsatisfactory. It is true that Margaret Smith, who was seventy-five

years old at the time her deposition was taken, bases her evidence, that she knew the time of *Martha's* birth, upon the recollection that she was born about a month later than her own son, and he was born November 7, 1864. She testifies, however, that she had not refreshed her recollection from any records or documents at the time she gave her testimony, and it is apparent on reading it that she was much confused as to dates, which of course would be natural for a person of her age, especially considering the remoteness in time of the facts to which she testified. As an instance of how the witness confused dates the following will suffice: To the question, "Tell us as near as you can about when he left to go to the army?" she replied, "He left during the winter, along after Christmas in 1864, as well as I remember." Her counsel then suggests, "You mean in 1863 after Christmas, don't you?" and she answered, "What I meant was 1863." "*Q.* You mean after Christmas, 1863?" "*A.* It is *1864* after Christmas, I guess. Just not knowing these things beforehand I just can't remember. I am getting old." The testimony of Margaret E. Terry, who was seventy years old at the time her deposition was taken and who lived on a farm adjoining that of Samuel Richmond, is still more vague and unsatisfactory. She does, however, testify that *Martha* was born in December, 1864, but she says she was not present at her birth, adding: "I am white and she was a low-down, black slave. We didn't visit negroes." The addendum suggests at least the unimportance of the event to her. She claims she remembers the date by a remark her mother made at the time *Martha* was born, but what that remark was is not disclosed by the testimony.

Were the question of the paternity of *Martha* dependent solely upon the date of her birth, as shown by the testimony, then this court would perhaps not disturb the finding of the trial court that *Martha* was not the child of Thomas Richmond. But in our view of the case the question of the pa-

ternity of the child must be determined not alone upon the testimony as to what particular month and year *Martha* was born, but upon the whole evidence in the case. It is obvious that two women of the ages of seventy and seventy-five, respectively, called upon to testify as to the month and year in which a negro child was born forty-six years previously, without any opportunity for refreshing their recollections from family records or otherwise, would be apt to make a mistake of at least a few months, if not years, as to the date of such birth. Such a mistake, even as to the date of the birth of one of their own children, would not be strange or unlikely, much less that of a child of a negro slave. We deem the fact that Thomas Richmond up to the time that he had the misunderstanding with *Martha* in 1901, and even thereafter, shortly before he died, always spoke of and acknowledged her as his child, more persuasive and controlling than the testimony of the two above mentioned witnesses. No one was in a better position to know the truth of the matter than were he and Sarah Smith, and it does not appear that either of them claimed *Martha* had any other father than Thomas Richmond. The latter, in 1898, when answering the pension department, said *Martha* was his daughter, and that he believed she was born in 1865. He fixed the date of her birth later than did Margaret Smith and Margaret E. Terry. It seems, therefore, that Thomas Richmond did not regard the fact that *Martha* was born as late as 1865 as any reason why he was not her father. As before stated, he knew best whether or not it was, and his conclusion on that subject, adhered to for practically over forty years, ought not to be lightly brushed aside or nullified by the dim, uncertain memory of two old women as to the exact date of such an unimportant event as the birth of a slave child over forty-seven years ago.

The trial judge speaks of Thomas having acknowledged *Martha* to be his daughter under a mistake as to her paternity.

The record is barren of any fact that came to the knowledge of Thomas Richmond as to the paternity of *Martha* after 1872. In 1871 or 1872 he visited Macon, Missouri, where Sarah Smith then lived, and where she continued to live till the time of her death in 1886. He then knew that she had several children of which he was not the father, yet as late as 1891 he writes to *Martha* and addresses her as "Dear daughter" and signs himself "Your father" or "Your affectionate father." 'She came to live with him and kept house for him for eight or nine years, during which time he held her out as his daughter, spoke of her as such, and she was known as such in the neighborhood in which he lived. That the children William and Adeline were his is not disputed, although they were known by the name of Smith in Macon, where they resided until their death. Practically the only doubt that is cast upon the paternity of *Martha* is the testimony of Margaret Smith and Margaret E. Terry to the effect that she was born in December, 1864. If there be a mistake as to that, then there is no greater uncertainty as to the paternity of *Martha* than of that of Adeline and William. We have therefore reached the conclusion that the county judge was correct in finding that *Martha* was the child of Thomas Richmond and that the trial court erred in finding that she was not the child, either legitimate or illegitimate, of Thomas Richmond.

It is strenuously urged by the appellants that Thomas Richmond and Sarah Smith were married according to the custom of slaves and that *Martha* was born in wedlock. There is considerable testimony to sustain the claim of such marriage. Of course if there was a lawful marriage *Martha* needed no legitimation. Assuming, however, that *Martha* was illegitimate, the question arises, Did Thomas Richmond in writing acknowledge himself to be her father so as to entitle her to inherit his estate? Sec. 2274, Stats., provides that "Every illegitimate child shall be considered as heir of

the person who. shall, in writing signed in the presence of a competent witness, have acknowledged himself to be the father of such child, and shall in all cases be considered as heir of his mother, and shall inherit his or her estate, in whole or in part, as the case may be, in the same manner as if he had been born in lawful wedlock." At least two facts must co-exist to constitute legitimation under the statute, namely, an illegitimate child and a written acknowledgment of the paternity thereof by some person according to the statutory provisions. The statute applies only to illegitimate children. *Grant v. Mitchell,* 83 Me. 23, 21 Atl. 178. But it is not essential that the written acknowledgment shall be made for the express purpose of establishing heirship or of a compliance with the statute. It may be made in entire ignorance of the statutory requirements and for purposes other than that of creating heirship, provided there is otherwise a compliance with the statute. *In re Rohrer,* 22 Wash. 151, 60 Pac. 122; *Blythe v. Ayres,* 96 Cal. 532, 31 Pac. 915. Its requirements are an acknowledgment by a person in writing, signed in the presence of a competent witness, that he is the father of the illegitimate child. When such a writing is produced the statute is satisfied. It does not require that the witness should attest or subscribe the writing or acknowledgment—only that the person making it shall sign in the presence of the witness. *In re Pederson's Estate,* 97 Minn. 491, 106 N. W. 958; *Blythe v. Ayres, supra.* Neither does it require that the acknowledgment of paternity shall be in precise formal language. It is sufficient if it appear with reasonable clearness and certainty from the written words that the paternity of the child is acknowledged. *Crane v. Crane,* 31 Iowa, 296. So, also, the law of the domicile of the person making the written acknowledgment, and not that of the domicile of the child or the mother, governs the question of legitimation. *Blythe v. Ayres, supra; Moen v. Moen,* 16 S. Dak. 210, 92 N. W. 13.

In the present case, in reply to inquiries made by the government relative to a matter of great importance to the deceased, he declared that *Martha* was his daughter. The acknowledgment of paternity was made in unmistakable terms and under such circumstances as to exclude inadvertence or mistake. The instrument was signed by him in the presence of Mr. Webb, a competent witness. It must be held that such writing fully satisfies the requirements of the statute. The pension statement is supplemented by letters written to *Martha* addressing her as daughter, or dear daughter, in which the deceased declared himself to be her father. At least one of these letters was signed by him, through Mr. Carthew, and in his presence as a competent witness. A number of cases, in addition to those already mentioned, in which various similar declarations have been held a sufficient acknowledgment of paternity under substantially similar statutes, is added for reference. *Brown v. Iowa Legion of Honor,* 107 Iowa, 439, 78 N. W. 73; *Britt v. Hall,* 116 Iowa, 564, 90 N. W. 340; *In re De Laveaga's Estate,* 142 Cal. 158, 75 Pac. 790; *Thomas v. Estate of Thomas,* 64 Neb. 581, 90 N. W. 630. In the following cases the evidence was held insufficient to show acknowledgment under the statute: *Watson v. Richardson,* 110 Iowa, 673, 80 N. W. 407; *Lind v. Burke,* 56 Neb. 785, 77 N. W. 444; *Moore v. Flack,* 77 Neb. 52, 108 N. W. 143.

The question is raised by counsel for appellants that since the deceased, in compliance with the statute, acknowledged *Martha* to be his daughter, she is entitled to inherit even though in fact she was not his child. Having found that he was her father, it becomes unnecessary to decide the question, and it is reserved for future determination.

*By the Court.*—Judgment reversed, and cause remanded with directions to affirm the judgment of the county court.