DAISY D. MOORE ET AL., APPELLANTS, V. HENRY J. FLACK,
APPELLEE.

FILED JUNE 20, 1906. No. 14,378.

1. **Marriage:** EVIDENCE. Evidence examined, and *held* insufficient to
show a common law marriage between plaintiff's mother and
the deceased.

2. **Bastards:** ACKNOWLEDGMENT OF PATERNITY. A writing to constitute
an acknowledgment of paternity within the provisions of section
31, ch. 23, Comp. St. 1903, must be one in which the paternity

is directly, unequivocally and unquestionably acknowledged. *Lind v. Burke*, 56 Neb. 785, followed and approved.

3. ——: ——: EVIDENCE. Evidence of a writing, claimed to have been addressed by the deceased, Robert Moore, to the mother of an illegitimate child and said to contain the words, "Take good care of our boy, and call him Thomas Moore, and I will give him a good start some day," examined, and *held* insufficient to constitute a valid acknowledgment of paternity within the meaning of the statute.

APPEAL from the district court for Kearney county: CONRAD HOLLENBECK, JUDGE. *Affirmed.*

*James Clay, E. C. Calkins, John Lathrop* and *Joel Hull,* for appellants.

*J. C. Paulson* and *M. D. King, contra.*

OLDHAM, C.

On the 18th day of August, 1889, Robert Moore, a former resident of the state of Kentucky, died intestate in Kearney county, Nebraska, seized in fee of a quarter section of land situated in that county. Thereafter J. W. Gilman was duly appointed administrator of the estate, and administration of the estate was finally closed and the administrator discharged in January, 1891. During the progress of the administration the right of heirship to the estate was contested between one John F. Moore, who claimed the estate as a half brother of the deceased, and a minor named Daisy D. Moore, plaintiff herein, who claimed to be the daughter and sole heir of the deceased. The minor claimant was represented in the contest by a guardian *ad litem,* who is her attorney in the present suit. The contest over the heirship was continued from term to term in the county court, and evidence was taken, and the county court found in favor of the alleged half brother and against the claims of Daisy D. Moore. Thereafter the lands in controversy passed by mesne conveyances from John F. Moore to the present defendant, Henry J. Flack,

who purchased them on July 12, 1892, and has since occupied and cultivated the lands as his own. In January, 1903, Daisy D. Moore filed her petition in the district court for Kearney county, alleging ownership of the lands in dispute as the daughter and sole heir at law of Robert Moore, deceased. The petition was subsequently amended and asked, in substance, to set aside the former decree of the county court that declared John F. Moore the sole heir at law of Robert Moore, deceased, alleging that said decree was procured by fraud and perjury, and asking to have all mesne conveyances from John F. Moore to defendant Flack canceled and held for naught, and that the title to the lands in controversy be quieted in her. Another alleged child of Robert Moore, named Thomas Moore, intervened in the suit, and filed a petition in which he alleged that he was the illegitimate son of the deceased, that he had been recognized in writing as such by the deceased in the presence of a competent witness, and that because of such recognition he was entitled to the inheritance as the sole heir at law of Robert Moore, deceased. He further alleged that he was an infant in Kentucky at the time of the proceeding in the probate court of Kearney county, Nebraska, and that he had neither personal nor constructive notice of such proceeding, and that within one year after his arriving at his majority he had intervened in the suit to assert his rights. He also alleged that John F. Moore, to whom the inheritance had been awarded in the county court, was a bastard and not a legitimate half brother of Robert Moore, deceased. Defendant answered each of these petitions, alleging his ownership of the lands by mesne conveyances from John F. Moore, and pleaded the proceeding in the county court as a bar to the claims of both plaintiff and intervener. On issues thus joined there was a trial to the court, and a judgment for the defendant, and the petitions of both plaintiff and intervener were dismissed. To reverse this judgment the plaintiff and the intervener have prosecuted their separate appeals to this court.

We will separately examine the claims of each of the contestants in the light of the evidence revealed in the bill of exceptions. The proof offered in support of the claims of heirship is contained in depositions taken at various places, and from these depositions it appears that Robert Moore, deceased, was born and raised in Rowan county, Kentucky; that he was never married; that his father and mother had each departed this life before his death; that he was the natural father of both plaintiff and intervener, the former by a widow, named Mrs. Steele, and the latter by Miss Omie Oney.

Plaintiff, in support of her claim of heirship, alleged a common law marriage between the deceased and her mother. This claim, however, is wholly unsupported by competent testimony. The evidence of Mrs. Steele, the mother of plaintiff, shows that she never was married to the deceased; that she never claimed to be his wife while she lived with him in Kentucky; that, while he visited her frequently and was the father of her child, yet she makes no claim that they lived together as husband and wife, or that he ever held her out to the world as such. What she does claim is that the deceased promised that he would marry her if she would come to Nebraska with him, and that he would get a minister to perform the ceremony, but that soon after arriving in this state he took sick and died without having any ceremony performed. According to Mrs. Steele's testimony the deceased only lived about ten days after arriving in Nebraska. She further testified that she was drawing a pension as the widow of her former husband (Steele), who was a soldier in the United States army during the rebellion. To our minds this evidence is wholly insufficient to support the claim of a common law marriage between plaintiff's mother and the deceased, and it will therefore be unnecessary to determine whether or not plaintiff is estopped by the judgment of the county court to again assert her right of heirship in the lands of the deceased.

As. this disposes of plaintiff's petition, we will now

examine the contention of the intervener and the suffi-
ciency of the testimony offered to support his claim under
section 31, ch. 23, Comp. St. 1903, which provides: "Every
illegitimate child shall be considered as an heir of the
person who shall, in writing, signed in the presence of a
competent witness, have acknowledged himself to be the
father of such child." It appears from the testimony that
the deceased had been adjudged the father of the inter-
vener in a bastardy proceeding instituted against him in
the county court of Rowan county, Kentucky; and it was
the recollection of the county judge presiding at the trial
that the deceased had admitted in court that he was the
father of the child. But there is no evidence that such
admission was made, if at all, in writing. The intervener
also introduced the deposition of one Allan Gearheart,
who testified that he had resided for many years in Rowan
county, Kentucky, and that he had known the deceased,
Robert Moore, since 1870; that he last saw him at Farmers,
Rowan county, Kentucky, shortly before he went to Ne-
braska, and he further testified as follows: "(6) The last
time you saw Robert Moore, did you or not have any
conversation with him relative to Omie Oney's bastard
child Thomas? If so, state all the facts fully. A. Yes,
sir. We were talking about Omie Oney's bastard child in
Farmers, Rowan county, Kentucky, and he (Robert
Moore) said he wanted to get the child away from her. He
said it was his child. He said he had had the child adopted
by her consent and he wanted me to assist him in getting
the child away. (7) Did he or not say or do anything else
on that occasion in this connection? A. Yes, sir. He
wrote her (Omie Oney) a note. (8) Where is that note,
if you know? A. I don't know where it is. I gave it to
Omie Oney. (9) Do you remember what was in the note,
or the substance of what was in it? A. Yes, sir; in part.
(10) Do you remember the substance of what was in the
note? A. Yes, sir. (11) Please state all that was in the
note, or substance of same; what you did with the note.
A. It says: 'I am going to leave. I have to leave you. I

bid old Kentucky good bye for a while. I don't just know when I will be back. Take good care of our boy, and call him Thomas Moore, and I will give him a good start some day.' And I gave the note to Omie Oney, and read it for her. She could not read. (12) Is what you have stated all of the substance of what the note contained? A. It is all that I remember. (13) How far was Farmer, Rowan county, Kentucky, from where Omie Oney lived at that time? A. Five miles west. (14) Did Omie Oney at that time live near a postoffice or telegraph station? A. Not nearer that Moorehead, three miles. (15) How often did she (Omie Oney) go to the postoffice? A. I don't know that she ever went. * * * (18) Were you or not very intimate with Robert Moore? A. Yes, sir. We were particular friends. (19) Did you or not ever see Robert Moore with Thomas Moore? If so, state the facts relative thereto. A. Yes, sir, I have seen him with the child and nursing the child. After Omie Oney moved on my place, Robert Moore would come over and stay two days at a time with the child, staying at my house at night."

Witness on cross-examination said that the letter was written and signed in his presence. He also testified that he knew that Omie Oney could neither read nor write and that was the reason that he read her the note. He said there were other things in the note, but not very many, and that he had not thought of the note during the 16 years intervening between the day he read it and the day he gave his deposition. Omie Oney testified that she could neither read nor write, but that she remembered the contents of the note, just as stated by Gearheart, and that she put the note away in a paper box with some other papers, and that it was lost, and she was unable to find it. It is clear that the evidence with reference to the bastardy proceeding is wholly insufficient to show an acknowledgment within the provisions of section 31, *supra*. So the only question is as to the sufficiency of the testimony of Gearheart and Omie Oney to establish an acknowledg-

ment, in writing, by the deceased of the paternity of the intervener. There are many facts and circumstances surrounding this alleged writing which are, in themselves, neither satisfactory nor clearly convincing either as to the exact contents of the writing or as to the probability of its ever having been executed. While it is true that the witness of the instrument is unimpeached, and the mere fact that he testified by deposition should not, and does not, in any manner impair the credibility of his testimony, yet the circumstances surrounding the writing sought to be proved are of such a nature as to demand that proof of the contents of the note, as alleged, should be very carefully scrutinized. At the time the communication is alleged to have been written, intervener's mother was living on a place owned by the witness Gearheart, and both the witness and the deceased knew that she was wholly illiterate, and it is hard to conceive what object deceased would have had in sending Gearheart with a written message to read to her when he might as well have communicated with her orally.

But, passing from the dubious circumstances surrounding the proof of the writing to its contents, the question arises: Is it a sufficient recognition to create an heirship within the meaning of section 31, *supra?* The material portion of this note as testified to is: "Take good care of our boy, and call him Thomas Moore, and I will give him a good start some day." In *Lind v. Burke,* 56 Neb. 785, the sufficiency of an acknowledgment of paternity under this section of the statute was examined into, and, while the question as to whether the instrument must have been acknowledged with the intent to create a right of heirship was not determined, yet it was there said:

"We are satisfied that a writing, to fulfil the requirement of the law   *   *   *   must be at least one in which the paternity is directly, unequivocally, and unquestionably acknowledged." It is further said in the opinion: "It must not be forgotten in this examination that it is not because the person can be shown to be the offspring, or is

in fact the illegitimate child, that it may assert heirship, but because it has been in writing acknowledged; and hence the writing must be in and of itself sufficient, unaided by extrinsic evidence, to establish the paternity."

Under the rule here announced, the writing relied on is clearly insufficient. The reference to intervener as "our boy" in the note is not a clear and unequivocal acknowledgment of the paternity of the boy. Nor is the request that the child be named Thomas Moore equivalent to an acknowledgment that Robert Moore was the natural father of the child. Nor is the promise that "I will give him a good start some day" inconsistent with any other theory than that the writer of the note was the father of the child. In the later case of *Thomas v. Estate of Thomas,* 64 Neb. 581, it was decided that it was immaterial whether or not the writing was made with the intent to constitute an heirship, but the rule of strict construction of writings of this nature, when made, as announced in *Lind v. Burke, supra,* was not modified.

We are therefore of opinion that the evidence offered by the intervener is insufficient to establish his claim of heirship, and we recommend that the judgment of the district court be affirmed.

AMES and EPPERSON, CC., concur.

By the Court: For the reasons given in the foregoing opinion, the judgment of the district court is

AFFIRMED.