# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## HOOVER V. HOOVER.

### November 18, 1920.

### Rehearing November 17, 1921.

1. BASTARDY—*Legitimation—Subsequent Marriage—Canon and Common-Law Rules.*—While under the civil law, and the canon law which followed it, children born out of wedlock were rendered legitimate by the subsequent marriage of their parents, such was not the rule of the common law. Under the latter, the subsequent marriage of the parents did not render a bastard legitimate.

2. BASTARDY—*Legitimation—Subsequent Marriage—Essentials Under Virginia Statute—Burden of Proof.*—In order to be legitimate under section 5269, Code of 1919, it is necessary (1), That the man should have had a child by the woman; (2), that the man and woman should have intermarried after the birth of the child; and (3), that the child should have been recognized by the man before or after the marriage. These are facts to be proved as in any other case, and the burden is on the child to prove them.

3. BASTARDY—*Legitimation—Recognition.*—The proof of paternity and subsequent marriage may be ever so clear, but that is not enough. The child must be "recognized" by the man as his child. No amount of testimony on the part of the mother or other persons as to the paternity of the child can supply the place of recognition by the putative father. He, and he alone, can fulfill the requirement of the statute that the child shall be "recognized by him."

4. STATUTES—*Construction—Plain Language.*—The object of the interpretation and construction of statutes is to ascertain the meaning and intention of the legislature, and this is to be sought primarily in the language used. If this be plain, the courts have no right or power to do otherwise than give effect to it.

5. BASTARDY—*Legitimation—Construction of Section 5269, Code of 1919.*—The words of section 5269, Code of 1919, are clear and free from ambiguity, and manifest a clear intent on the part of the legislature to make recognition by the putative father essential to the legitimation of a bastard.

6. BASTARDY—*Legitimation—Construction of Section 5269, Code of 1919—"Recognized."*—The word "recognized," as used in section 5269, Code of 1919, means that the father should have acknowledged, accepted, admitted, or owned the child as his.

7. BASTARDY—*Legitimation—Recognition.*—In order for recognition of a bastard by its putative father to be binding, the recognition must be definite and certain, and one in which the paternity of the child is plainly and unequivocally acknowledged by the father.

8. BASTARDY—*Legitimation—Marriage as Recognition.*—Marriage is an evidential fact to be considered along with other evidence in determining the fact of recognition, but it is far from being conclusive and the surrounding circumstances may be such as to utterly divest it of all weight whatever, as where it is entered into at the point of a pistol. The value of the fact of marriage, therefore, as evidence tending to show recognition, must in each case depend upon the circumstances surrounding and attending the marriage.

## ON REHEARING.

## Burks, J., dissenting.

9. BASTARDY—*Legitimation—Recognition—Repudiation.*—If at any time the putative father unequivocally recognized the child as his, it is legitimate and his heir at law if he has married the mother, and it makes no difference how often upon other occasions he repudiated his paternity.

10. BASTARDY—*Legitimation—Marriage as Recognition—Case at Bar.*—The inference from marriage of recognition of the child is much stronger where the only force applied to bring about the marriage is the force which the seduction statute itself applies, than where the marriage is brought about hastily by physical force and threats of personal violence. In the instant case, the putative father, after his arrest, had six weeks for reflection and conference with his relatives, friends, and attorney. There were no threats except the threat to invoke the law, and no physical force was suggested by any one. From these facts

there is an inference that his marriage was deliberate and with the intention of assuming all the obligations to his wife and child which the law and sound public opinion under such circumstances would impute.

11. BASTARDY—*Legitimation—Sufficiency of Evidence—Case at Bar.*—In the instant case, besides the inference from marriage, there was much evidence to support the view, not only that the child was a daughter of the putative father, but that he recognized her as such, and the Supreme Court of Appeals, upon rehearing, was satisfied that the putative father by his silence when he should have spoken, and by his words, had recognized the child as his.

12. BASTARDY—*Legitimation—Recognition of Child—Presumption.*—Conceding that there are reasons for a fair difference of opinion upon the vital question of the recognition of the child as his by the putative father, every fair presumption should be indulged in favor of legitimacy rather than illegitimacy, and, in doubtful cases, in support of the judgment of the trial court.

Appeal from a decree of the Circuit Court of Rockingham county. Decree for complainant. Defendants appeal.

*Affirmed.*

The opinion states the case.

*C. R. Winfield* and *John T. Harris* for the defendants.

*Ward Swank* and *H. W. Bertram,* for the appellee.

BURKS, J., delivered the opinion of the court.

Emmanuel Hoover died intestate in 1918, leaving surviving him his widow, five adult children, and two grandchildren, who were the children of a deceased son, Luther Hoover. There also survived him the appellee, Winnie Hoover, who claims to be the child of Benjamin E. Hoover, who was a son of Emmanuel, and died intestate in 1903.

Emmanuel left real estate of the estimated value of $85,-000.00, and sufficient personal estate to pay his debts and the cost of administration. This suit was brought by Winnie Hoover for partition of said real estate, and from a decree in her favor, this appeal was taken.

The only question involved is the legitimacy of Winnie Hoover. She claims legitimacy under section 5269 of the Code, which is as follows: "If a man having a child or children by a woman, shall afterwards intermarry with her, such child or children or their descendants, if recognized by him before or after the marriage, shall be deemed legitimate."

This section was first enacted in 1785 and went into effect on January 1, 1787 (12 Hening's St. at Large, p. 139). It was as follows: "Where a man having by a woman one or more children, shall afterwards intermarry with such woman, such child or children, if recognized by him, shall be thereby legitimated." Two questions arose upon the construction of this statute. (1) Did the legitimation extend to the descendants of the child, where the marriage did not take place until after its death; and (2) could the recognition take place as well before as after the marriage? Both of these questions were answered in the affirmative by this court in *Ash* v. *Way's Adm'rs*, 2 Gratt. (43 Va.) 203, Two out of the five judges who sat in that case dissented, but the statute was thereafter amended at the revision of 1849, making the holding of the majority of the court statutory, and the statute was given to us in its present form. Code 1849, ch. 123, sec. 6; Report of Revisors, p. 636. The statute, from its inception, contained the words "if recognized by him," but they have not come before this court for interpretation except in the case of *Rice* v. *Efford*, 3 Hen. & M. (13 Va.) 225, where the father recognized the child by a devise in a will, which was refused probate be-

cause not executed according to law, "to my son, Thomas Shurley, born before wedlock," and which was held a sufficient recognition. Other cases cited in the briefs arising under the statute throw no light on the present controversy. They are *Sleigh* v. *Strider,* 5 Call. (9 Va.) 439; *Coutts* v. *Greenhow,* 2 Munf. (16 Va.) 363, 5 Am. Dec. 472; and *Bowles* v. *Bingham,* 2 Munf. (16 Va.) 442, 5 Am Dec. 497; *Id.,* 3 Munf. (17 Va.) 599.

[1-5] While under the civil law, and the canon law which followed it, children born out of wedlock were rendered legitimate by the subsequent marriage of their parents, such was not the rule of the common law. Under the latter, the subsequent marriage of the parents did not render a bastard legitimate. 1 Minor's Inst., pp. 408-9. Our statute, however, does not follow either. It declares that "if a man, having a child or children by a woman, shall afterwards intermarry with her, such child or children, or their descendants, if recognized by him before or after the marriage, shall be deemed legitimate." In order to be legitimated under this section, it is necessary (1) that the man should have had a child by the woman; (2) that the man and woman should have intermarried after the birth of the child; and (3) that the child should have been recognized by the man before or after the marriage. These are facts to be proved as in any other case, and the burden is on the child to prove them. It seems manifest that, under our statute, mere proof of paternity and subsequent marriage is not sufficient, for that would render meaningless the important qualification in the statute immediately following, to-wit: "If recognized by him." The proof of paternity and subsequent marriage may be ever so clear, but that is not enough. The child must be "recognized" by the man as his child. No amount of testimony on the part of the mother or other persons as to the paternity of the child can

supply the place of recognition by the putative father. He, and he alone, can fulfill the requirement of the statute that the child shall be "recognized by him." It was never intended that the responsibility of paternity of a child should be placed upon a man unless the child was "recognized by him." The question to be determined is not merely whether the man had a child by a woman and afterwards married her, but also, and in addition thereto, did the man recognize the child as his? The words "if recognized by him" constitute an essential part of the statute, and cannot be omitted or treated as a surplusage in the interpretation of the statute. The object of the interpretation and construction of statutes is to ascertain the meaning and intention of the legislature, and this is to be sought primarily in the language used. If this be plain, the courts have no right or power to do otherwise than give effect to it. "In giving construction to a statute, the courts are bound, if it be possible, to give effect to all its several parts. No sentence, clause or word should be construed as unmeaning or surplusage, if a construction can be legitimately found which will give force to and preserve all the words of the statute. 'It is a canon of construction that, if it be possible, effect must be given to every word of an act of parliament, but that, if there be a word or phrase therein to which no sensible meaning can be given, it must be eliminated.' " Black's Interp. of Laws, sec. 39, quoting *Stone* v. *Mayor, etc.,* L. R. 1, C. P. Div. 691-701. The words of the statute under consideration are clear and free from ambiguity, and manifest a clear intent of the part of the legislature to make recognition by the putative father essential to the legitimation of a bastard.

[6, 7] The word "recognized," as used in the statute, means that the father should have acknowledged, accepted, admitted or owned the child as his. If the evidence shows

that the appellee was recognized or acknowledged by Ben Hoover to be his child, then she is entitled to share in the estate of Emmanuel Hoover.  Otherwise not.  It is conceded by counsel for the appellants that the recognition may be either by words or acts, or both, and such we conceive to be law.  We shall enquire, therefore, was she "recognized by him before or after the marriage?"  The trial judge, while stating that there was considerable other evidence in the cause showing recognition by the father, rested his conclusions on the ground that "the marriage itself, under the circumstances which it occurred, was a full and solemn recognition" by Benjamin Hoover of the child as his.  It was unnecessary for him, therefore, to state what this "considerable other evidence" was.  Counsel for the appellee, however, relies upon the "other evidence," and undertakes to point it out, and also upon the marriage itself as a full and solemn recognition by the father.  It is necessary, therefore, for us to examine the case from both points of view.  Before doing so, however, it may be remarked that, in order for recognition, to be binding, it must be definite and certain, and one in which the paternity of the child is plainly and unequivocally acknowledged by the father.  *Campbell* v. *Carroll* (Ind. App.), 124 N. E. 407. As to the "other evidence" relied on by counsel for the appellee to prove the recognition, it is nowhere pointed out in the brief.  He contents himself with a simple reference to pages of the record on which the testimony of three witnesses begins, without pointing out specifically what statements he relies on, or giving reference to the pages of the record upon which such statements may be found, leaving the court to search the entire testimony of each witness to see if it can find any such recognition or acknowledgment on the part of the putative father.  We might well refuse this task, and, furthermore, the method of treatment of the

subject seems to indicate that little, if any, reliance is placed on the point. We have, however, undertaken it, and give the results of our investigation. The statement in appellee's brief is as follows:

"With respect to the statement made in said brief that it is conceded that complainant has 'utterly failed to establish recognition from the testimony,' we reply that no such concession has at any time been made, either by the complainant in the prosecution of her suit or by the trial court in its decision therein. We do not care to prolong the present note by a discussion in detail of all the facts which have been testified to in complainant's behalf. However, we respectfully direct the court's attention in this connection to the testimony of Hiram Hoover (record, p. 29), Mrs. Lydia Hoover (wife of Hiram Hoover) (record, p. 44), and Mrs. J. M. Stearn (nee Mattie Farrell, complainant's mother) (record, p. 52)."

It may be conceded that the testimony of Mrs. J. M. Stearn, mother of appellee, is to the effect that Ben Hoover did recognize the appellee as his child, but her character is so besmirched, and she is contradicted by so many witnesses on other important matters in the case, that her testimony cannot be accepted to overturn the statement and conduct of Ben Hoover from the date of the marriage to his death. In her bill for divorce, she stated that she was with child by Ben Hoover when she was married to him on May 22, 1896, and that the child (appellee) was born on July 13, 1896, when, in fact, the child was born April 16, 1896—six weeks before the marriage. She also stated in said bill that immediately after the marriage, Ben Hoover deserted and abandoned her. She testified in this cause that he continued to visit her for more than a month after the marriage. She also testified that after she was married, Ben Hoover spent four nights with her and occupied the same room with her

34

at Hiram Hoover's. Hiram Hoover, another witness for the appellee, testified that Ben came there, but never spent the night. She testified that in the fall after their marriage, Ben Hoover took her and the baby down to his father's to see his mother. In this she is contradicted by Susan Hizer, Mrs. Roadcap, Geo. W. Hizer, Nannie J. Rhodes, and perhaps others. She gave birth to a bastard child six weeks before her marriage with Ben Hoover, and four years thereafter, while suing for a divorce from Hoover, she was far advanced in pregnancy by Stearns, whom she subsequently married. It could hardly be expected that the testimony of this witness would be accepted in lieu of the testimony of other unimpeached witnesses.

Another witness called by the appellee to prove "recognition" was Hiram Hoover, the foster-father of the appellee, and whom Ben Hoover repeatedly stated or plainly intimated, he believed to be the father of the appellee. The nearest approach he makes to proving recognition is that Ben offered to compromise the seduction prosecution by the payment of $300, and after this was rejected, "he came back in a few days and said he had come to the conclusion to marry Mattie now and take care of her and the baby." On further examination on the specific subject of recognition, he was asked, and answered, as follows: "Q. Did Ben Hoover, at any time, say anything about the paternity of this child? A. No. Q. By 'paternity,' Mr. Hoover, I mean who was the father of the child? A. Well, he didn't say he was the father or that he was not, at that time." Nor does he testify to any such statement at any other time.

Lydia Hoover, the present wife of Hiram Hoover, was also called by the appellee as a witness. She says that, on one occasion, when Ben was helping her peel apples, his brother, Si, was there, "and Si commenced talking about it, regarding this child, and Si got up and went away and

Ben and I were there alone, and he said something that he would like to see his child, or something, I can't just say the words, and I asked him then, I said, 'Why don't you stay with her and take care of her?' and he said he would have, but his pa objected.  Q. To whom was he referring when he said he would like to see his child?  A. I suppose he meant the child of Mattie Farrell's."  The witness was then a young, unmarried woman of probably about twenty-seven years of age, and Ben Hoover a young man of probably twenty-three or four.  Aside from the improbability of such a conversation between persons of that age and condition, the testimony of the witness is entirely too indefinite to amount to proof of recognition.  The witness admits that she cannot give the language used—"he said *something* that he would like to see his child, *or something, I can't just say the words,*" and she supposes he referred to the child of Mattie Farrell.

These are all the witnesses called by the appellee to prove recognition.  Omitting the testimony of Mrs. Stearns, the testimony of the other two witnesses, standing alone and uncontradicted, hardly measures up to the standard of proof required in such cases, but, taken in connection with the other evidence in the cause, to ask this court to accept the testimony of these three witnesses as proof that Ben Hoover recognized the appellee as his child, would put a strain upon the credulity of the court that it is not able to bear.

[8] Whether the marriage itself, *under the circumstances of this case,* furnishes sufficient evidence of recognition, must now be considered.  We have already pointed out that proof of recognition by the father is essential, and that this is something separate and apart from, and in addition to, proof of paternity and subsequent marriage.  Marriage is an evidential fact to be considered along with other evidence in determining the fact of recognition, but it is far

from being conclusive, and the surrounding circumstances may be such as to utterly divest it of all weight whatever, as where it is entered into at the point of a pistol. The value of the fact of marriage, therefore, as evidence tending to show recognition, must in each case depend upon the circumstances surrounding and attending the marriage. The evidence in the case in judgment is in many respects conflicting. In ascertaining the surrounding facts and circumstances, we must, therefore, be controlled by what we conceive to be the weight of the evidence. From this standpoint, we find them to be as follows: Benjamin E. Hoover (sometimes mentioned in the record as Benjamin L. Hoover) was a young man, twenty-two years of age, and lived on the farm with his father, Emmanuel Hoover. He was in poor health and unable to earn more than from one to three hundred dollars a year. He visited Mattie E. Farrell once a week, or once in two weeks, for about three years prior to February, 1896, when his visits ceased. He frequently escorted her to church, basket meetings and other public gatherings. Mattie had been taken by Hiram Hoover and his wife, when a child about four years of age, and had been reared by them as a member of their family. The wives of Emmanuel Hoover and Hiram Hoover were sisters, and they themselves were cousins. They resided in the same general neighborhood, and the intercourse between the two families was frequent. On April 16, 1896, Mattie gave birth to a girl child, who is the appellee in this suit. On the next day, April 17, 1896, Hiram Hoover swore out a warrant before a justice of the peace for the arrest of Benjamin Hoover, charging that he had seduced Mattie under a promise of marriage. This warrant for the arrest of Ben Hoover was placed in the hands of two officers, who arrested him, but the record does not show the date of the arrest. The officers who arrested him carried him to his

father's house to secure bail for his appearance before the justice. At this meeting, there were present the two officers, Whitting and Estep, and Ben Hoover, Emmanuel Hoover and Philip M. Hoover. Neither of these officers testified in the cause, nor was their absence accounted for. Ben Hoover and Emmanuel Hoover are dead, Philip M. Hoover testified that on this occasion Emmanuel said to Ben: "Well, Ben, you have got yourself in bad shape; I think the best thing you can do is to go on and marry that girl and live with her," and that Ben replied: "Father, I won't do that; that child is not mine, and I will see her in hell first before I will do that; I will go to the penitentiary before I will own that child." At that time his mother was in an advanced stage of tuberculosis, and died the following January. Ben was her principal nurse. Some time after this, Ben offered to compromise the case at $300, but, failing in this, agreed to marry Mattie, and the marriage took place May 22, 1896. He remained with her that night, but there is no evidence of any intercourse. According to his statement to Mrs. Frank, they occupied different rooms. He left the next morning before breakfast, and, according to the great weight of the testimony, never thereafter lived with her, visited her, or in any way, by word or act, recognized or acknowledged the child to be his. He avoided his wife whenever he knew of her presence, and on one occasion, when ushered into her presence without knowing she was there, he spoke to other persons present, and not to her, and immediately left the room. The record is replete with testimony showing his repudiation of the paternity of the child, and his avoidance of contact with his wife down to the day of his death in 1903. These facts are testified to by eleven witnesses, showing his repudiation of the paternity of the child, both before and after the marriage, and covering the period from the birth of the child until his

death. They are full and explicit, and state time, place and circumstances. It would simply encumber this opinion to state them in detail. In his answer to his wife's bill for divorce, sworn to by him, he denied that he ever "at any time either promised to marry the complainant or had sexual intercourse with her," and this denial was consistently maintained both by words and conduct throughout the residue of his life. We search this record in vain for any "recognition by him," save as hereinbefore stated, which saving has been already sufficiently discussed.

The statute under which the appellee claims title was not enacted in aid of the statute against seduction. It was in force nearly a century before the seduction statute was enacted, and the marriage therein referred to was a voluntary marriage and not one entered into to bar a prosecution for felony, and no doubt if a man voluntarily married a woman who was *grossment enciente*, or shortly after the birth of a child, the marriage itself would afford all the evidence necessary of recognition by the husband of the paternity of the child. But that is not this case. Here, the man himself was not in good health, his mother in the advanced stages of tuberculosis, and he is arrested on the charge of seduction under a promise of marriage, and threatened with the rigours of the law. He is without means or the prospect of accumulating any. Without in any way acknowledging the paternity of the child, he undertakes to buy his peace. He offers a compromise of $300, but this is rejected, and $1,000 demanded. Unable to raise this sum, he determines to marry the woman as the best means of avoiding the risk and shame of a public trial, and the marriage was celebrated. It may be that it was a fearful price to pay for the immunity, and that most men who were innocent would never have paid it, but all men are not equally courageous and have not the same control of

their nervous systems, and Ben Hoover states in his answer to the bill for divorce, at a time when he had no interest to misrepresent the facts, that he was "badly frightened and terrorized by the fact of his arrest and the subsequent threat on the part of the complainant and her representatives, which was frequently repeated, that unless he did marry the complainant, they would prosecute the charge against him and have him sent to the penitentiary, and, in consequence of such fright and threats, he was induced to enter into said alleged marriage," though he protested that he never, "at any time either promised to marry complainant or had sexual intercourse with her." He did not know what she would undertake to prove on the criminal prosecution, but the sympathy of the jury is always with the woman in such prosecutions. It may be noted in this connection that the wife, the mother of the appellee, testified in this cause, and if her testimony on the criminal prosecution had been the same as in this case there never could have been a conviction. She says that the first time Ben Hoover ever mentioned the subject of marriage to her was in November, 1895, when she told him of her condition. Furthermore, she makes no mention of any wiles, enticements, flatteries or other statements by which he led her moral nature astray. The circumstances of her life then and afterwards would seem to indicate if there was any seduction it was by the woman, rather than the man. It is insisted in the argument for the appellee that, as Ben Hoover was publicly charged in the warrant with the seduction of Mattie E. Farrell, under promise of marriage, his subsequent intermarriage with her placed him in the position of one entering a plea of guilty to the charge. But this is by no means true. Under the circumstances of the case, he was rather in the position of a defendant who enters the plea of *nolo contendere*—that is to say, so far as the criminal prosecu-

tion is concerned, and in order to bar the prosecution, I will so far admit guilt as to marry her, but this act of marriage is not to be used against me in any other proceeding or for any other cause.

It may be, as has been suggested, that if Ben Hoover had died immediately after the marriage ceremony and there had been no other evidence in the cause, the marriage alone might be regarded as sufficient evidence of recognition by him to have rendered the appellee legitimate, but the marriage alone would not have had that effect if it had been shown that Ben Hoover had stated just before the marriage that he was not the father of the child, had never had anything to do with her mother, but was unable to compromise the matter, and was going to marry her to get rid of the criminal charge. The marriage was a valid legal marriage and imposed upon Ben Hoover the obligation of husband to Mattie E. Farrell. He could not take advantage of the provision of the statute to bar the criminal prosecution and thereafter evade the obligations of husband; but the obligation of husband is one thing, that of parent quite another. The marriage, under the circumstances of this case, was not a plain and unequivocal recognition by Ben Hoover of the appellee as his child. In this connection, counsel for the appellee rely upon *Miller* v. *Pennington,* 218 Ill. 220, 75 N. E. 919, 1 L. R. A. (N. S. ) 773, and quote from the opinion as follows:

"So, also, the Iowa Code provides that to entitle an illegitimate child to inherit from the father, the recognition of the child by the father must have been general and notorious or in writing. *Watson* v. *Richardson,* 110 Iowa 673. Our statute does not require either, but is similar to the Indiana statute, which provides that if the father shall marry the mother of a bastard child, and acknowledge it as his own, the child shall be regarded as legitimate. In

construing the statute, the Supreme Court of Indiana has held that an acknowledgment by the father removes from the child the status of illegitimacy, no matter what the purpose of the acknowledgment was, or whether the father intended to make the child his heir; and that it fixes the status of the child, which cannot be changed by anything the mother or father might afterwards say. The court said: 'Having removed the "bar sinister," they cannot replace it.' *Brock* v. *State*, 85 Ind. 397; *Binns* v. *Dazey*, 147 Ind. 536, 44 N. E. 644. That seems to be the correct interpretation of our statute, the purpose of which is to fix the status of the child as legitimate. It seems to us that it would be an unjust and unwarranted construction of the law to say that the father of an illegitimate child who has legitimated it by marrying its mother and acknowledging it to be his, can thereafter change its status by any subsequent declaration. All that the statute requires in respect to the acknowledgment is that the father shall own or admit the child to be his."

We see nothing in this quotation which in any way militates against the views hereinbefore expressed. That case simply discusses the effect of an acknowledgment or recognition after it has once been established, and holds it to be irrevocable "by anything the mother or father might afterwards say." Much more to the point is the case of *Campbell* v. *Carroll* (Ind. App.), 124 N. E. 407, which refers to *Miller* v. *Pennington*, and in which it is said:

"The appellant complains that the court committed reversible error in admitting in evidence, over appellant's objection, the record of bastardy proceeding, in which Ovid Campbell was charged with the paternity of appellee, Carroll. The proceeding was before a justice of the peace, and was compromised, the record showing that the parties 'agree to compromise this cause upon the following terms,

to-wit: The defendant pays the relatrix the sum of $50.00 in cash this day, and executes two notes of even date herein for $125.00 each, payable in one and two years from date, and payable to Martha Carroll, trustee, for Nora Carroll, the relatrix herein being under the age of twenty-one years, and the said trustee being her mother.

"There is no admission or acknowledgment of paternity in the record. It may not even be implied from such a record of compromise. Many men would submit to such a wrong as this, if wrong it may be, rather than to submit to the embarrassment of a public trial and the gibes of the rabble who usually gather on such occasions. The acknowledgment must be definite and certain, and must be one in which the paternity of the child is plainly and unequivocally acknowledged. *Holloway* v. *McCormick,* 41 Okla. 1, 136 Pac. 1111, 50 L. R. A. (N. S.) 536; *Moore* v. *Flack,* 77 Neb. 52, 108 N. W. 143; *Pederson* v. *Christofferson,* 97 Minn. 491, 106 N. W. 958; 7 Cyc. 949. The record of compromise should not have been admitted. *Martin* v. *State,* 62 Ala. 119; *Olson* v. *Peterson,* 33 Neb. 358, 50 N. W. 155; *Lisy* v. *State,* 50 Neb. 226, 69 N. W. 768."

The marriage in the instant case was in the nature of a compromise or adjustment of the criminal prosecution.

Counsel for the appellee also rely upon a dictum of Chief Justice Marshall, on circuit, in *Stegall* v. *Stegall,* 2 Brock. 256, Fed. Cas. No. 13, 351. In that case it was sought to *illegitimate* a child born in wedlock. In the course of the opinion, the following language is used, which is quoted by counsel for the appellee, the italics being those of counsel:

" 'In such case as this, if the marriage had taken place in such an advanced stage of pregnancy that the situation of the wife must have been known to the husband, I should be disposed to consider it as a recognition of the child afterwards born. *Any conduct of the husband, after the birth,*

*indicating a belief that the child was his, would have been
entitled to great weight, and would probably have been de-
cisive.'* "

The chief justice was speaking of a voluntary marriage
to a woman in an advanced stage of pregnancy, followed by
birth during wedlock, where every presumption possible of
legitimacy is indulged. His remarks could have no appli-
cation to a case like this where the conduct of the husband
is fully explained and the marriage was had for an ulterior
purpose.

In *Townsend* v. *Meneley,* 37 Ind. App. 127, 132, 74 N. E.
274, 275, another Indiana case, in speaking of the burden
of proof to be borne by the bastard in cases involving the
right of inheritance, it is said: "Before she would be en-
titled to inherit under the statute, it was incumbent on her
to show an acknowledgment that was clear and unam-
biguous, and such as would exclude all but one interpre-
tation." Surely such cannot be said of the testimony be-
fore us. If it be conceded that the testimony on behalf of
the appellee was sufficient to prove that Ben Hoover was
the father of the appellee, that would simply be a compli-
ance with the first requisite of the statute, "if a man have
a child or children by a woman," and the subsequent mar-
riage of the man and woman would not legitimate such child
or children. Both of these requisites must exist, but the
fact that a man has a child by a woman and afterwards
marries her is not enough. As hereinbefore pointed out,
although he is shown by the most conclusive evidence, other
than his own acknowledgment, to have been the father of
the child, the subsequent marriage with the woman will not
legitimate the child. There must be something more, and
this something must emanate from the father himself, the
child must be "recognized by him." Furthermore, the lan-
guage or conduct relied upon as a recognition must be such

as can have no other meaning than an acknowledgment by the father that the child is his. It must be plain and unequivocal.

There is another view of the case, amply supported by the record, which shows the importance of the recognition required by the statute. Mattie Farrell must have been a woman of easy virtue, as she was pregnant before both marriages; but her pregnancy in the first instance was not discovered until a short time before the birth of the child. Ben Hoover had been a regular visitor of hers for three years, but his visits ceased suddenly in February, 1896, and he did not visit her thereafter, as appears from the statements of both of them. The reason therefor appears, from his statements to his uncle, Noah Hoover, and also to Timothy Roadcap, that he found his uncle Hi in the bed with her. He then discovered her character, and if we may assume, contrary to his statements, that he had previously had no connection with her; he found out that he was not the only one, and that the other was one who had daily access to her. After the child was born and something was said about its likeness to the Hoovers, he repeatedly stated that the child "looked like a Hoover all right, but that it was not his," thus emphasizing his denial of his paternity and intimating who he thought the father was. These two people would be greatly interested to fix the paternity upon him, and he might well have feared to face the charge of seduction with their testimony against his. Under these circumstances, the marriage took place for the purpose of avoiding the trial for seduction; but, from the arrest of Ben Hoover until his death, he stoutly denied the paternity. How wise, then, is the provision of the statute which requires that the bastard shall be "recognized by him" before it can be legitimated.

Upon the whole case, we are of opinion that the evidence does not plainly and unequivocally show that Ben E. Hoover ever recognized the appellee, Winnie Hoover, as his child. The decree of the circuit court will, therefore, be reversed, and as the appellee, Winnie Hoover, has no interest in the subject matter of the suit, her bill will be dismissed, with costs to the appellants in this court and also in the circuit court.

## REHEARD NOVEMBER 17, 1921.

PRENTIS, J., delivered the opinion of the court.

[9] While in accord with the views expressed in the previous opinion (105 S. E. 91) as to the legal inferences to be drawn from the mere fact of such a marriage, a further consideration of the evidence in this case leads us to the conclusion that too much emphasis was there placed upon the testimony which was adverse to the appellee, Winnie Hoover, and that the evidence and the proper inferences therefrom in her favor were insufficiently emphasized. The vital question, as has been stated, is whether or not Benjamin Hoover ever, by words or conduct, acknowledged, accepted, admitted, or owned, that Winnie Hoover was his child. It makes no difference how often he repudiated his paternity, for the law so favors legitimacy rather than illegitimacy that if, at any time, he unequivocally recognized her as his child, she is legitimate and his heir at law. It is said in the former opinion, that "no doubt if a man voluntarily married a woman who was *grossment enciente,* or shortly after the birth of a child, the marriage itself would afford all the evidence necessary of recognition by the husband of the paternity of the child," and then fol-

lows the recital of the facts indicating that this marriage was not voluntary but the result of intimidation caused by his arrest and prosecution for seduction under promise of marriage. In this connection it is proper, however, to observe, that there is no evidence in the record of any threat from any source, whatever, except the prosecution itself and the threat to invoke the law. No physicial force was suggested by any one. The accused promptly gave bail for his appearance. He employed counsel, known to this court to be exceptionally competent, to advise him and to protect his legal rights. Six weeks elapsed between the time of his arrest and the marriage. The proposition to relieve himself of the prosecution by the payment of money came from him, and when he failed in his effort the offer to marry Mattie Farrell, the mother of Winnie Hoover, came from him. There was no particular haste about it. He was told to bring his own pastor; instead of this, two days later he appeared with the pastor of the church to which the woman belonged. The marriage ceremony took place in the home of Mattie Farrell, in the presence of her foster father and mother, and after the ceremony they together retired to an upstairs room, and according to her testimony spent the night in the same apartment, whereas, according to some of the witnesses who undertake to repeat Hoover's statements, they did not sleep in the same room, but in adjacent rooms open to each other.

[10] The inferences to be made from a marriage of this sort, where the only force applied is the force which the statute itself applies, while not conclusive, have a significance far greater than where the marriage is brought about hastily by physicial force and threats of personal violence. Benjamin E. Hoover, after his arrest, had six weeks for reflection and conference with his relatives, friends and attorney, and there is an inference therefrom that his act

was deliberate and with the intention of assuming all of the obligations to his wife and child which the law and sound public opinion under such circumstances would impute. Any lesser inference tends to defeat the apparent purpose of the seduction statute, which is to require the seducer to right his wrong, as much in the interest of his innocent child as for the sake of the woman.

[11] There is, however, much more to support the view, not only that Winnie Hoover is his child, but that he recognized her as such. His wife, the child's mother, whose testimony must always be considered in such cases, testifies to the fact of such recognition emphatically and unequivocally. The previous opinion emphasized the fact that in her bill for divorce the birth of the child was improperly alleged to have taken place after instead of before her marriage. It should be observed in this connection, however, that the bill was signed by counsel; that it was a mere bill for a divorce upon the ground of desertion, and that the date of the birth of the child and whether born before or after the marriage was entirely immaterial so far as the issue raised in that case was concerned; the only vital allegations being, the residence of the parties, the marriage and the desertion for more than three years. So that such a mistake may have been merely the result of lack of information on the part of the attorneys who drew the bill.

Then much has been said of the answer and cross-bill of Benjamin E. Hoover in this divorce suit, but here too the significant facts are, that the answer filed as a cross-bill did not deny the marriage and desertion, and though as a cross-bill it alleged that the marriage was invalid because induced by his own fright and the threats which had been made against him, the cross-bill was withdrawn. It also appears that although that suit was pending for several months, Hoover never appeared as a witness in support of

the allegations of his cross-bill, and never at any other time, when it is alleged that he made the various statements attributed to him which are relied upon to show his lack of recognition, was he under oath or subject to cross-examination.

Then Hiram Hoover testified that shortly after the marriage Benjamin E. Hoover took his wife and the child to the home of Emmanuel Hoover, his father, to visit his mother. It must also be noted that although the accusation was clear and definite, at no time, either before or after the marriage, did Benjamin E. Hoover ever deny to Hiram Hoover, the foster father of his wife, that he was the father of the child. This question and answer appear:

"Q. After the marriage and while the wife and child were living in your family, did Ben Hoover ever attempt to explain to you his failure to provide a proper home and support for the wife and child?

"A. He said it was on account of his father."

This finds striking confirmation in the opposing testimony where it is shown that Emmanuel Hoover, the father of Benjamin E. Hoover, expressed his extreme displeasure on one occasion when this mother and child went to see his sick wife and remained there certainly for two days. Then this question and answer appear:

"Q. Please state whether or not Mr. Hoover, in any of the conversations which you had with Ben Hoover concerning either the charge of seduction, the marriage, or the support of the wife and child, Ben Hoover ever denied that he was the father of Winnie Hoover?

"A. No, he never denied it."

Now one may recognize his child as well by conduct as by words, and this failure of Benjamin Hoover to deny

the paternity of the child when so explicitly charged there-
with by the woman involved and her natural protector, is
certainly conduct which is inconsistent with the claims
which are now made.   Then there is in addition the testi-
mony of another witness, Mrs. Lydia Hoover, the second
wife of Hiram Hoover, who before and at the time of the
marriage lived in the home of Emmanuel Hoover, the father
of Benjamin Hoover.   She too testifies that he said the rea-
son he did not live with his wife and take care of her was be-
cause his father objected to it.   And she testifies that he
spoke of the child as his child.   The conversations with this
witness took place after he had been charged by his wife
with being the father of her child as well as after the mar-
riage was notorious in the community.   So that it seems to
us that there was nothing improper or even improbable in
such a discussion or conversation between these two.   Had it
occurred before the marriage, it would have been most un-
natural.   Her testimony is that Benjamin E. Hoover, in ex-
press language, recognized the child as his own.   It cannot
be discarded without imputing perjury to this witness, who
is entirely disinterested, and her opportunities for such con-
versations are supported by other admitted facts and cir-
cumstances.   That Hoover, on various other occasions de-
nied to his relatives and friends that he was the father·
of the child is inconsistent but not in conflict therewith.
It is not unusual, however, for men overtaken in such a
fault as that with which Hoover was accused, to deny their
guilt circumstantially,  vigorously and frequently.   The
question, however, is not how often he denied it, but
whether at any time he recognized Winnie Hoover as his
child.

Upon further reflection we are satisfied that by his con-
duct, by his silence when he should have spoken, and by his
words, he has recognized Winnie Hoover as his child.   The

35

contrary view will tend to defeat the manifest policy of the seduction statute, and indicate an easy pathway for the seducer who desires to evade his responsibility to the community, his legal duty to his wife, and his obligation to remove the bar sinister from the innocent child of his loins, who is entitled to bear his name.

[12] Conceding that there are reasons for a fair difference of opinion upon the vital question of fact here involved, every fair presumption should be indulged in favor of legitimacy rather than illegitimacy, and, in doubtful cases, in support of the judgment of a trial court.

For the reasons indicated, we have concluded to affirm the decree.

BURKS, J., dissenting.

*Affirmed.*